2012 ND 201

**Sharon WHEELER, Plaintiff and Appellant**

v.

**SOUTHPORT SEVEN PLANNED UNIT DEVELOPMENT, Carl Bye, Individually, and as a member of the Board of Directors, Defendants and Appellees.**

No. 20110323.

Supreme Court of North Dakota.

Sept. 27, 2012.

Deborah J. Carpenter, Bismarck, N.D., for plaintiff and appellant.

Charles (Casey) L. Chapman, Bismarck, N.D., for defendants and appellees.

CROTHERS, Justice.

[¶ 1] Sharon Wheeler appeals from a judgment requiring her to pay assessments to defendant Southport Seven Planned Unit Development ("Southport"). We conclude the district court did not err finding Southport had authority to impose assessments against Wheeler as a property owner in Southport, the court did not err finding the amount Wheeler owed Southport and the court did not err in ordering Wheeler to pay Southport costs. We affirm.

I

[¶ 2] In August 1997, the Southport Development Limited Liability Company filed an amended declaration for the Southport Development Planned Unit Development Project I in south Bismarck. The developer had created the Southport development, which was split into several smaller planned unit developments ("PUDs"). The parties do not dispute the defendant Southport is "one and the same" as the Southport PUD Project I under the amended declaration governing the Southport development. The amended declaration was recorded in the Burleigh County register of deeds on August 15, 1997, and the preamble provides that Southport Development, "as the owner of the [real property], does hereby dedicate the same to a planned unit development project as herein defined, which project shall be subject to the terms, conditions, and provisions of this Declaration, which terms, conditions, and provisions shall be deemed to run with the land and inure for the benefit of the undersigned developer and all purchasers of the units in the project, in perpetuity." The amended declaration states "[n]o portion of the subject project may be removed from the project by vacation or partition, except by the unanimous consent of all record title owners of all of the PUD lots and the holders of all mortgages which constitute mortgage liens upon the subject PUD lots and tracts." The amended declaration also provides for a Southport association of owners, with each unit owner "deemed" a member of the association.

[¶ 3] In September 2005, Wheeler purchased a home in Southport by warranty deed, which provided:

"WITNESSETH, for and in consideration of the sum of Ten Dollars ($10.00), grantor does hereby GRANT to the grantee all of the following real property lying and being in the County of Burleigh, State of North Dakota, and described as follows, to-wit:

"TRACT 1240, OF LOTS THREE (3) AND SEVEN (7), BLOCK ONE (1), SOUTHPORT PHASE II TO THE CITY OF BISMARCK, BURLEIGH COUNTY, NORTH DAKOTA PURSUANT TO THE PLAT FILED FOR RECORD AS DOCUMENT NO. 628834, AS INCORPORATED INTO SOUTHPORT DEVELOPMENT PLANNED UNIT DEVELOPMENT PROJECT I DECLARATION OF PROJECT RECORDED AS DOCUMENT NO. 494065, AS AMENDED, LOCATED UPON LOT 7, BLOCK 1, SOUTHPORT PHASE II; LOT B–1 AND LOT C OF LOT 53, BLOCK 1 SOUTHPORT, AND TRACTS 1406 AND 1408 OF LOT 7, BLOCK 1, SOUTHPORT PHASE II AND LOT 54, BLOCK 1, SOUTHPORT, AND LOT B OF LOT 54, BLOCK 1, SOUTHPORT, ALL IN THE CITY OF BISMARCK, BURLEIGH COUNTY, NORTH DAKOTA, TOGETHER WITH AN UNDIVIDED INTEREST IN THE COMMON AREAS DECLARED APPURTENANT TO SUCH UNIT.

"And the grantor for itself, its successors and assigns, does covenant with the grantee that it is well seized in fee of the land and premises aforesaid and has good right to sell and convey the same in manner and form aforesaid; that the same are free from all incumbrance, except installments of special assessments or assessments for special improvements which have not been certified to the County Auditor for collection, and except easements, rights-of-way, restrictive covenants, and mineral conveyances and reservations of record, and the above granted lands and premises in the quiet and peaceable possession of the grantee, against all persons lawfully claiming or to claim the whole or any part thereof, the said grantor will warrant and defend."

[¶ 4] In 2005 and 2006, Wheeler paid Southport fees, dues, and assessments, including fees for snow removal and lawn care. Wheeler, however, was not satisfied with either the snow removal or the lawn care provided by Southport, and in about 2006, she sent a letter to the Southport association, indicating she no longer wanted, and would not pay for, snow removal or lawn care. Wheeler paid for snow removal on one occasion in 2007. In 2007, the Southport association initially filed a lien against Wheeler's property for unpaid assessments, but later withdrew the lien because of a failure to send notice to Wheeler by certified mail. In 2008, Southport filed another lien on her property after notice was given by certified mail. That lien later was released when Wheeler paid funds into escrow.

[¶ 5] In 2009, Wheeler commenced this action against Southport seeking relief from the imposition of dues, fines, and liens filed by Southport against her property and seeking damages for slander to title. Southport answered and counterclaimed for unpaid assessments. The district court granted Southport partial summary judgment, ruling that Wheeler was obligated to pay assessments set by the association because her lot was within Southport PUD Project I; that Wheeler had constructive notice of the amended

declaration; and that the association had authority to charge assessments for the maintenance. The court also granted summary judgment dismissing Wheeler's claims for severance from or to disband the association, for slander of title and for Southport's requested injunctive relief. After a bench trial the district court denied Wheeler's claim for release of the escrow funds under the doctrine of accord and satisfaction, dismissed Wheeler's claims against the defendants, enjoined her from preventing the Southport association from performing lawn care, snow removal and other activities authorized by the amended declaration, and awarded Southport a judgment for $2,124.22. Wheeler moved for post-judgment relief under N.D.R.Civ.P. 59 and 60, which the court denied.

## II

[¶ 6]   Wheeler argues the district court erred in granting partial summary judgment on her claim that Southport lacked authority to impose dues or assessments for non-common areas. She contends that the amended declaration permitted assessments for only common areas, that no common areas existed, that Southport did not set up an appropriate organization or follow proper rules to make assessments and that the dues collected from the other owners were by "joint agreement," which did not fall under the declaration or bylaws and were not binding on her.

[¶ 7]   Our standard for reviewing a grant of summary judgment under N.D.R.Civ.P. 56 is well-established:

"Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record."

*Loper v. Adams,* 2011 ND 68, ¶ 19, 795 N.W.2d 899 (quotations omitted).

## A

[¶ 8]   Southport is a planned unit development. A planned unit development or PUD is a specialized form of zoning ordinance and "differs from the traditional zoning in that the type, density and placement of land uses and buildings, instead of being detailed and confined to specified districts by local legislation in advance, is determined by contract, or deal, as to each development between the developer and the municipal administrative authority, under broad guidelines laid down by state enabling legislation and an implementing local ordinance." *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 898 (7th Cir. 2005) (quoting *Old Tuckaway Assocs. Ltd. P'ship v. City of Greenfield,* 180 Wis.2d 254, 509 N.W.2d 323, 326 n. 1 (Wis.Ct.App. 1993)); *see also* 7 Richard R. Powell, *Powell on Real Property* § 53B.01 (Michael

Allan Wolf ed., 2012). Although zoning ordinances are not the same as restrictive covenants running with the land and binding subsequent purchasers, one court explained there is little real difference:

"A covenant is a contract and an ordinance isn't—though a PUD is very close to being a covenant because . . . it is the product of a deal between a developer and a municipality. No matter; a zoning ordinance has the same effect as a covenant because, unless worded to bind only the current owner, it limits the use of the land by whoever owns it, not just whoever owned it when the ordinance was enacted. . . . [A] zoning variance creates a restriction that runs with the land, just like a covenant; and there is no relevant difference between a variance and a PUD."

*Sts. Constantine & Helen Greek Orthodox Church,* at 899 (internal quotations omitted). *See also Benjamin Crossing Homeowners' Ass'n, Inc. v. Heide,* 961 N.E.2d 35, 40–41 (Ind.Ct.App.2012) ("The creation of a planned unit development is a legislative act and PUD provisions are zoning ordinances," and "[r]estrictive covenants and zoning ordinances, including planned unit development ordinances, are tools used to restrict the use of real property.").

■■ [¶ 9] Generally, a "covenant to contribute one's share of the neighborhood's maintenance expenses is characterized as an affirmative covenant." *Lake Arrowhead Comm. Club, Inc. v. Looney,* 112 Wash.2d 288, 770 P.2d 1046, 1049 (1989) (citing 5 R. Powell & P. Rohan, *Real Property* ¶ 675[2][a] (1988); 6 P. Rohan, *Home Owner Associations and Planned Unit Developments Law and Practice* § 8.03[2] (1988)). "As a matter of law, covenants for payment of annual assessments for operation of property owners associations are covenants running with the land," which "may be enforced by sub-

sequent assignees or successors in title to the original parties." *Griffin v. Tall Timbers Dev., Inc.,* 681 So.2d 546, 550 (Miss. 1996) ("The law is clear that the right to form a homeowners association runs with the land, and thereby binds subsequent assigns and successors of the original developer."); *see also Richards v. Abbottsford Homeowners Ass'n,* 809 S.W.2d 193, 195 (Tenn.Ct.App.1990) (Covenants "are valid and are binding on all purchasers with notice."); *Perry v. Bridgetown Cmty. Ass'n, Inc.,* 486 So.2d 1230, 1232 (Miss. 1986) ("The restrictive or protective covenant is generally created by a grant in a deed or by reference in a deed to a general plan of development. Restrictive covenants have been interpreted to be covenants running with the land and enforceable not only between the original parties, but also upon subsequent owners of the realty.").

■ [¶ 10] Courts have said planned unit developments present a "modern trend in residential living," and "[d]eed restrictions and covenants are vital to the existence and viability of such communities, and 'if clearly established by proper instruments, are favored by definite public policy.'" *Lakes of the North Ass'n v. TWI-GA Ltd. P'ship,* 241 Mich.App. 91, 614 N.W.2d 682, 686 (2000) (quoting *Oosterhouse v. Brummel,* 343 Mich. 283, 72 N.W.2d 6, 8 (1955)). "A servitude, such as a restrictive covenant, 'is created . . . if the owner of the property to be burdened . . . conveys a lot or unit in a general-plan development or common-interest community subject to a recorded declaration of servitudes for the development or community.'" *View Condo. Owners Ass'n v. MSICO, L.L.C.,* 127 P.3d 697, 702 (Utah 2005) (quoting Restatement (Third) of Property: Servitudes § 2.1 (2000)). *See generally* Restatement (Third) of Property: Servitudes § 6.2 & cmt. a (2000) (discussing

common-interest created by declaration which impose obligations by servitudes, including to pay dues or assessments, and providing automatic and mandatory membership in an association of owners).

[¶ 11] North Dakota law governs real property located within this state. N.D.C.C. § 47–04–01. Section 47–04–24, N.D.C.C., defines covenants running with the land:

"Certain covenants contained in grants of estates in real property are appurtenant to such estates and pass with them so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee in the same manner as if they personally had entered into them. Such covenants are said to run with the land."

"The only covenants which run with the land are those specified in this chapter and those which are incidental thereto." N.D.C.C. § 47–04–25. Section 47–04–26, N.D.C.C., identifies specific covenants running with the land:

"All covenants contained in a grant of an estate in real property, which are made for the direct benefit of the property or some part of it then in existence, run with the land. Such covenants include covenants:

1. Of warranty;

2. For quiet enjoyment;

3. For further assurance on the part of a grantor; or

4. *For the payment of rent, taxes, or assessments upon the land on the part of a grantee.*"

(Emphasis added.)

[¶ 12] "All covenants are either 'affirmative' or 'negative.'" 9 Richard R. Powell, *Powell on Real Property* § 60.06[1] (Michael Allan Wolf ed., 2012). While an affirmative covenant "requires the covenantor either to perform some act, or to continue the status quo as represented[,] a negative covenant binds the covenator not to perform an act." *Id.* (footnotes omitted). "Affirmative covenants often involve promises to pay periodic charges for maintenance within a development, but also often concern special assessments for repairs or improvements, payments for the use of an easement, or payments for the receipt of water." *Id.* at § 60.06[2][a] (footnotes omitted). "Covenants to pay money have been enforced against successors to the covenantor as covenants running with the land at law, covenants running with the land in equity, or liens enforceable against the covenator's land." *Id.* (footnotes omitted). "In most cases, the appropriate relief has been an injunction against future breaches and, if necessary, damages for past breaches." *Id.* at § 60.07 (citing *Nonnenmann v. Lucky Stores, Inc.*, 53 Ill.App.3d 509, 10 Ill.Dec. 714, 368 N.E.2d 200 (1977); *Peters v. Davis*, 426 Pa. 231, 231 A.2d 748 (1967); *Albright v. Fish*, 138 Vt. 585, 422 A.2d 250, 252 (1980)).

[¶ 13] In the context of restrictive covenants, we have said a landowner may sell land subject to covenants so long as they are not contrary to public policy. *See Hill v. Lindner*, 2009 ND 132, ¶ 8, 769 N.W.2d 427; *Allen v. Minot Amusement Corp.*, 312 N.W.2d 698, 702 (N.D.1981). Although not favored, restrictive covenants are given full effect "when clearly established," and interpretation is governed by the rules for contract interpretation. *Hill*, at ¶ 8. Generally, covenants are construed as a whole "to ascertain the parties' intent in light of the surrounding circumstances and words must be given their plain and ordinary meaning." *Hill*, at ¶ 8 (citing 9 *Powell on Real Property*, at § 60.05; *see also* N.D.C.C. §§ 9–07–02; 9–07–04; 9–07–06; 9–07–09; and 9–07–12).

B

[¶ 14] Here, the district court found that Wheeler had notice of the Southport association because the amended declaration was recorded, that the association had authority to determine and charge assessments to the lot owners within Southport and that the association had authority to charge Wheeler assessments. The court construed the amended declaration and concluded that the association had the authority to charge assessments for the maintenance of "grassy areas in the project" without a limitation to common property, and, further, that the amended declaration demonstrated common property existed while owned by the developer and that a 2009 quit claim deed showed the developer transferred the common property to the association. The court held that there was no question common property exists.

[¶ 15] As relevant to this case, the amended declaration includes a "Covenant For Maintenance and Assessments," stating "Every owner of a lot in this project shall be deemed by acceptance of such deed of ownership to covenant and agree to pay to the Association: a) Annual assessments or charges; and b) Special assessments for improvements or necessary repairs and maintenance to the common areas located within the project...." Article VI, section 2 of the amended declaration provides the association with authority to contract for the removal of snow from driveways and mowing the project's "grassy areas":

"The assessments levied by the Association shall be used exclusively to promote the recreation, health, safety, and welfare of the residents in the properties and for the improvement and maintenance of the common areas. *The Association may enter into contracts with any person or entity for snow removal*

*from the common roadways and driveways or for the mowing and maintenance of the grassy areas of the project.*" (Emphasis added.) The amended declaration outlines annual assessments, and specifically provides in section 3:

"The regular annual assessments shall be determined by the Board of Directors of the Association of Owners and notice of such annual assessment shall be given to the owners by the Board prior to the date such assessments are levied and certified for payment. The annual assessments shall be prorated to provide for the monthly payment thereof and shall be based upon the projected and anticipated costs and expenses of the Association for the maintenance and improvement of the common area, liability insurance for the common area, property insurance for any structures or improvements owned by the Association and the like...."

[¶ 16] Under the amended declaration, "[b]oth the annual and special assessments must be fixed at a uniform rate for all lots in the project with each lot owner being responsible for an equal proportionate share of the total assessment." The amended declaration specifically provides for the association's remedies for nonpayment of assessments:

"Any assessment not paid within 30 days from the date the same is due shall bear interest at the legal rate from the specified due date. The Association of owners may bring an action in a court of competent jurisdiction to seek a monetary judgment against the delinquent obligor in a sum equal to the amount due, with interest, together with the costs of the action and reasonable attorney's fees. In addition or in the alternative, the Association may perfect a lien against the real property of the delinquent obligor as located within the pro-

ject and may bring an action in a court of equity to foreclose the lien in the manner and method as provided by law. *No owner may attempt to waive or escape liability for such obligation on any theory that such owner has received no benefit for the services rendered or repairs or improvements made or to be made, or that he/she has not used the common property or that such owner has abandoned his or her lot and property.* Liability for payment of any assessment is based *solely on the fact of record title ownership in any lot and tract in the project* and shall not be based upon the actual benefits conferred or the degree of enjoyment of the common area by any one lot owner."

(Emphasis added.)

[¶ 17]   In this case, Wheeler purchased her residential property in 2005, and it is undisputed that her property is within the Southport planned unit development.   Wheeler's warranty deed plainly states in its legal description that her property is within Southport and that the property is subject to covenants.   The amended declaration for Southport was recorded, and Wheeler is charged with constructive notice of its contents, including provisions imposing covenants running with her property.   *See* N.D.C.C. § 47–19–19 ("The record of any instrument shall be notice of the contents of the instrument, as it appears of record, as to all persons.").

[¶ 18]   The amended declaration unambiguously provides the association with authority to remove snow from driveways and to mow the project's grassy areas, without limitation to only common areas.   We conclude Southport· has the authority under the amended declaration to access Wheeler's property for these purposes and Wheeler was obligated to pay the assessments imposed by Southport as provided for in the amended

declaration.   We conclude the district court did not err in granting partial summary judgment in Southport's favor.

[¶ 19]   In addition to arguing Southport lacked authority to impose dues or assessments for non-common areas, Wheeler contends the district court erred in determining the "existence of a contract and its scope" and contends the amended declaration is a contract of adhesion and contains oppressive and unconscionable terms. Wheeler argues the court should consider whether the homeowner knowingly, freely and intentionally entered into the contract to encumber her property, knowing that, as interpreted by the association and the district court, there is no enforcement of the duty on the part of Southport to provide any services, that is, there was no consideration for her "membership fees." However, Wheeler's arguments are unavailing.   As discussed, Wheeler's obligations to Southport are imposed by the covenants running with the land and she is bound by the amended declaration's relevant provisions by the purchase of her property within the development.

[¶ 20]   We conclude Wheeler failed to raise a material fact issue precluding the district court's summary judgment in favor of Southport.

C

[¶ 21]   After granting partial summary judgment, the district court held a bench trial addressing Wheeler's monetary obligation .to Southport and her affirmative defense of accord and satisfaction, including the effect of her March 2007 payment for $70 to the president of Southport, which in the memo line stated "paid in full snow removal–07."

[¶ 22]   Section 9–13–04, N.D.C.C., defines "accord" as "an agreement to accept in extinction of an obli-

gation something different from or less than that to which the person agreeing to accept is entitled." Section 9–13–05, N.D.C.C., defines "satisfaction" as "[a]cceptance by the creditor of the consideration of an accord extinguishes the obligation and is called satisfaction." "The accord is the agreement and the satisfaction is its execution or performance." *Peterson v. Ramsey Cnty.*, 1997 ND 92, ¶ 9, 563 N.W.2d 103 (quoting *Shirazi v. United Overseas, Inc.*, 354 N.W.2d 651, 654 (N.D. 1984)). Whether an accord and satisfaction exists is a question of fact. *Peterson*, ¶ 7.

[¶ 23] This Court's review of a district court's findings of fact in a bench trial is governed by the clearly erroneous standard under N.D.R.Civ.P. 52(a). *See Farmers Union Oil Co. v. Smetana*, 2009 ND 74, ¶ 10, 764 N.W.2d 665. "In an action tried on the facts without a jury ... the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." N.D.R.Civ.P. 52(a)(1). "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, there is no evidence to support it, or if ... on the entire evidence [this Court] is left with a definite and firm conviction a mistake has been made." *Prchal v. Prchal*, 2011 ND 62, ¶ 11, 795 N.W.2d 693 (quotations omitted). "[W]e do 'not reweigh evidence or reassess witness credibility when the evidence supports the court's findings.'" *Id.* (quotation omitted).

[¶ 24] After trial, the district court found there was a reasonable inference Wheeler offered the check on the condition that her 2007 assessments for snow removal would be discharged. The court also concluded there was an infer-

ence of satisfaction because Southport endorsed and deposited the check. The court found Southport accepted and cashed the March 2007 check for $70 and found this was in acceptance of Wheeler's offer to pay in full for the 2007 snow removal. The court found Southport's total assessment for snow removal in 2007 was $194.40. The court concluded Wheeler should be credited $124.40 as the difference between the 2007 snow removal assessments and the amount accepted as full payment. The court ordered judgment entered against Wheeler in the amount of $1,609.27 for her obligation to Southport, less the credit of $124.40.

[¶ 25] Although Wheeler argues Southport's acceptance of her check listing "full payment" should have resulted in a statutory extinction of her "earlier alleged debt" under N.D.C.C. § 9–13–04, Southport contends she was not relieved from her further obligation to pay assessments. Southport argues Wheeler did not have a valid defense against its claim for monthly assessments and the court did not clearly err in finding the association did not agree to release her from any further obligation to pay assessments by accepting Wheeler's 2007 check. Southport further asserts the court properly enjoined Wheeler from preventing Southport's right to access Wheeler's property for lawn care, snow removal and other activities authorized by the amended declaration. We agree.

[¶ 26] The district court's findings are limited to snow removal in 2007, leaving Wheeler responsible for further assessments. Those findings are supported by the evidence and are not clearly erroneous. Based on our review of the record, we conclude the district court did not err in imposing judgment in the amount of $1,609.27, less a credit of $124.40, for a judgment of $1,484.87. We affirm the judgment dismissing Wheeler's claims

against the defendants, enjoining her from preventing the Southport association from performing lawn care, snow removal and other activities authorized by the Southport amended declaration and awarding Southport $2,124.22 from Wheeler.

### III

[¶ 27] Wheeler argues the district court erred in granting Southport costs. She argues the court erred based on a purported failure "to properly position the pre-summary judgment discovery costs as genuine Rule 68 costs" and asserts the court erred by including nonrecoverable costs in a judgment after she objected to their inclusion.

[¶ 28] After judgment was entered in favor of the defendants for $2,124.22, which included an award of costs and disbursements in the amount of $639.35, Wheeler moved for relief under N.D.R.Civ.P. 59 and 60. She sought reconsideration of the court's judgment for taxing costs purportedly not properly pleaded under the rules and reconsideration of the court's injunctive ruling in part based on newly discovered evidence.

[¶ 29] We have treated motions for reconsideration as motions to alter or amend a judgment under N.D.R.Civ.P. 59(j) or as a motion for relief from a judgment or order under N.D.R.Civ.P. 60(b). *See Vanderscoff v. Vanderscoff*, 2010 ND 202, ¶ 7, 790 N.W.2d 470; *Dvorak v. Dvorak*, 2001 ND 178, ¶ 9, 635 N.W.2d 135. Under either N.D.R.Civ.P. 59(j) or 60(b), the district court's decision will not be reversed on appeal absent an abuse of discretion. *Vanderscoff*, at ¶ 9 (Rule 60(b) not reversed on appeal absent an abuse of discretion); *Korynta v. Korynta*, 2006 ND 17, ¶ 7, 708 N.W.2d 895 (Rule 59(j) motion to amend is reviewed under abuse of discretion standard). When we review a court's

decision on post-judgment motions for relief, we decide "whether the court abused its discretion in ruling the moving party did not establish sufficient grounds for disturbing the judgment or order." *Vanderscoff*, at ¶ 9.

[¶ 30] Additionally, an award of costs under N.D.C.C. § 28–26–10 and an award of disbursements under N.D.C.C. § 28–26–06 is within the district court's discretion and will not be overturned on appeal absent an abuse of discretion. *Holkesvig v. Welte*, 2011 ND 161, ¶ 12, 801 N.W.2d 712; *WFND, LLC v. Fargo Marc, LLC*, 2007 ND 67, ¶ 47, 730 N.W.2d 841. "A [district] court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when it misinterprets or misapplies the law." *Holkesvig*, at ¶ 12; *Vanderscoff*, 2010 ND 202, ¶ 9, 790 N.W.2d 470.

[¶ 31] Here, in denying Wheeler's post-judgment motion, the district court concluded the expenses correctly were awarded to Southport as the prevailing party because summary judgment was entered in Southport's favor and the court found in Southport's favor at trial. The court also held Wheeler's objection to costs under N.D.R.Civ.P. 68 was misplaced. Because Southport was the prevailing party, the court did not abuse its discretion by awarding Southport costs and disbursements.

### V

[¶ 32] We · have considered Wheeler's remaining arguments and deem them to be without merit or unnecessary to our decision. The judgment is affirmed.

[¶ 33] BENNY A. GRAFF, S.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER and DALE V. SANDSTROM, JJ., concur.

[¶ 34]   BENNY A. GRAFF, S.J., sitting in place of VANDE WALLE, C.J., disqualified.